UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JONATHAN BIGGAR,<br><br>    Plaintiff,<br><br>    v.<br><br>PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al.,<br><br>    Defendants. | Case No.15-cv-04825-JST<br><br>**ORDER GRANTING JUDGMENT FOR DEFENDANTS**<br><br>Re: ECF Nos. 49, 50 |

Before the Court are the parties' cross motions for summary judgment.  ECF Nos. 49, 50.
The Court will grant judgment for Defendants.

I.      **FACTUAL FINDINGS**

        A.      **Biggar's Employment at Google**

        Until 2013, Plaintiff Jonathan Biggar was a Senior Software Engineer at Google.  ECF No.
50 at 6; ECF No. 49 at 8.  In that role, Biggar "enhance[ed] and maintain[ed] the automation
software that manages the repair progress for Google's datacenter computers."  Administrative
Record[1] ("AR") 1179-92.  More specifically, Biggar had the following responsibilities:

-       Act as tech lead for small to medium-size project; of moderate complexity
        and impact; in that role manage project priorities and technical resources,
        may manage people

-       Contribute substantially to re-design of applications to improve
        maintenance cost, testing functionality, platform independence and
        performance

-       Independently design medium or large-size projects that are a part of a
        multi-system project

-       Contribute to core team processes and contribute code to efforts outside

_____

[1] Filed under seal at ECF No. 47.

own project, including those with Google wide impact

-   Support, maintain and upgrade code and participate in necessary redesign
    and reimplementation of existing components

AR 859.

As a Google employee, Biggar participated in the Google Inc. Welfare Benefits Plan ("the Plan"). AR 231-97. The Plan includes a Long Term Disability Coverage Policy ("LTD Policy"), which provides coverage under the following conditions:

You are totally disabled when as a result of your sickness or injury:

•   you are unable to perform with reasonable continuity ***the substantial and material acts*** necessary to pursue your usual occupation; and

•   you are not working in your ***usual occupation***.

After 24 months of payments, you are totally disabled when, as a result of the same sickness or injury, you are unable to engage with reasonably continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity.

AR 2003.[2] The Plan contains the following key definitions:

***Substantial and material acts*** means the important tasks, functions and operations generally required by employers from those engaged in your usual occupation that cannot be reasonably omitted or modified. In determining what substantial and material acts are necessary to pursue your usual occupation, we will first look at the specific duties required by your Employer or job. If you are unable to perform one or more of these duties with reasonable continuity, we will then determine whether those duties are customarily required of other employees or individuals engaged in

---

[2] Defendants also point out the specific provisions of the Plan related to mental health, but does not explain their relevance in its argument. Nevertheless, the Court replicates those provisions here:

Disabilities which are primarily due to mental illness have a limited pay period during your lifetime. The limited pay period for disabilities which are primarily due to mental illness is 24 months during your lifetime.

Mental illness means a psychiatric or psychological condition regardless of cause. Mental illness includes but is not limited to schizophrenia, depression, manic depressive or bipolar illness, anxiety, somatization, substance related disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine.

AR 2010-11.

2

United States District Court
Northern District of California

your usual occupation. If any specific, material duties required of you by your Employer or job differ from the material duties customarily required of other employees or individuals engaged in your usual occupation, then we will not consider those duties in determining what substantial and material acts are necessary to pursue your usual occupation.

***Usual occupation*** means any employment, business, trade or profession and the substantial and material acts of the occupation you were regularly performing for your Employer when the disability began. Usual occupation is not necessarily limited to the specific job you performed for your Employer.

AR 2003-04.

### B. Biggar's Parkinson's Disease Diagnosis

In 2007, Biggar began experiencing a tremor in his left arm and pain in his right shoulder and was diagnosed with Parkinson's Disease. AR 82. Dr. Grace Liang of the Parkinson's Institute in Mountain View began treating Biggar in 2009. AR 982-83. Dr. Liang's initial exam in 2009 reported coordination problems with Biggar's left hand that impacted his typing abilities, frequent tremors, problems with his balance, and sleepiness due to his medications, among other things. AR 982. Dr. Liang summarized that Biggar was "generally able to function well, though having some degree of impairment in fine motor skills and coordination, balance." AR 983. She prescribed several medications to try to alleviate Biggar's symptoms. Id.

Biggar claims his disease progressed steadily following his diagnosis. For example, in May 2010, Dr. Liang's notes report that Biggar was "[n]oticing a little more tremor." AR 1106. Then, in September 2010, Liang wrote that Biggar's "[t]remor is a little more intense recently . . . . Wife finds it progressively worse . . . . Voice quieter, mumbling, has to repeat sometimes." AR 1176. By 2012, Biggar claims that he was "experiencing a number of symptoms (sleep disturbance, attention deficit and memory trouble, appetite problems and depression) that are caused by Parkinson's Disease that adversely affected [his] ability to perform [his] job." AR 1181. Dr. Liang's notes in 2012 reinforce this progression. AR 1172 ("[P]atient has experienced some more progression."); AR 1168 ("Since last visit, patient has had some increased symptoms."). Nonetheless, her examinations[3] during this time note that Biggar had "normal"

---

[3] Dr. Liang's patient visit notes are broken down into several sections. See, e.g., AR 1121-23. To begin, she describes Biggar's "Interim History," which generally involves his self-reported symptoms since their last visit. Further down on the report is an "Examination" section, which is further broken down into "General Examination," "Neurological," and "Movement disorder exam." The subcategories within these examinations appear to be standard on all Dr. Liang's

mental status and motor strength.  E.g., AR 1173.

According to Biggar, his symptoms worsened substantially in 2013, when he began "experiencing significant problems with tremors and rigidity in [his] upper and lower extremities, difficulties with mobility, impaired ability to concentrate, decreased ability to write and type on a computer, and related symptoms of depression."  AR 1182.  Biggar visited Dr. Liang multiple times in early 2013 and her notes give conflicting descriptions of his condition.  In January 2013, Liang reported that "[s]ince last visit, patient has had more tremors overall."  AR 1161.  But she also concluded that "[e]verything else ok in terms of mobility, walking" and summarized Biggar's "[s]ymptoms [as] fairly stable, perhaps slightly more tremor but still able to function overall fairly well."  Id.  Dr. Liang saw Biggar again in February 2013.  She explained that Biggar reported "experience[ing] more trouble with performance at work, partly b/c the sleepiness in the afternoon."  AR 1157.  She also recounted Biggar's "frustration b/c hand is slowing, locking up clicking the mouse."  Id.  Both his tremor and his depression had increased since the last visit.  Id.  Indeed, Dr. Liang in her general examination noted moderate tremors in Biggar's left hand and mild tremors in his right hand.  AR 1158.  At this appointment Liang also discussed with Biggar the possibility of Deep Brain Stimulation Surgery ("DBS") as a method for reducing his current symptoms.  Id.[4]

In addition to seeing Dr. Liang for treatment of his Parkinson's Disease, Biggar also saw Dr. Minyang Mao, a psychiatrist, for depression.  AR 327.  Unfortunately, Dr. Mao's notes documenting his visits with Biggar are nearly impossible to read.  E.g., AR 860.  A doctor retained by Defendants as a part of this appeal spoke with Dr. Mao, however, and summarized his conversation as follows:

Dr. Mao stated that he had seen the claimant for 33 sessions from 6/2014-6/2015.

notes.  For example, she always states whether she observes a "rest tremor" or "Action/Postural tremor" during Biggar's visits.

[4] According to Biggar, "DBS surgery entails the implantation of several electrodes into the brain which the patient is able to adjust with a remote control.  The surgery is intended to help control Parkinson's related tremors and improve slow movement and extremity freezing."  ECF No. 50 at 11 n.2 (citing www.ninds.nih.gov/Disorders/All-Disorders/Deep-Brain-Stimulation-Parkinsons-Disease-Information-Page).

> He states that claimant had as much objective evidence of depression "as is possible in psychiatry." The claimant had inconsistent grooming, had psychomotor retardation, loss of weight, often sat with a blank state and continued to express apathy with poor concentration and admitted to not doing household chores or paying bills.

AR 1233. Dr. Mao also stated that Biggar received an evaluation at Stanford that confirmed this diagnosis, but Biggar never provided those records to Defendants. AR 1233.

### C.    First Work Absence and LTD Benefits Request

On March 25, 2013, Biggar stopped working and submitted a claim to Defendant Prudential Insurance Company of America ("Prudential") under the LTD Policy. AR 591-93. Dr. Liang submitted an Attending Physician Statement ("APS") in support of Biggar's claim, which listed the following "medical facts" related to Biggar's condition:

> Impaired motor skills due to tremors + pain, unable to use keyboard/computer. Unable to remain alert during daytime working hours due to insomnia. Unable to sit or stand for extended periods. Debilitating depression related to Parkinson's Disease and stress and pressures of work causing effects on sleep, appetite, concentration.

AR 18. Dr. Liang recommended that Biggar "[r]eturn to work after appropriate therapies + pending future assessment." Id. Dr. Mao also submitted an APS, listing Biggar diagnosis as Major Depressive Disorder. AR 111-13. On November 27, 2013, Prudential approved Biggar for long-term disability benefits. AR 1286-92. During his absence from work, Biggar had the DBS surgery referenced above. AR 60-97.

### D.    Biggar's Return to Work

On February 17, 2014, Biggar returned to work part time. AR 461-62. His first post-DBS surgery appointment with Dr. Liang took place on February 24, 2014. AR 1133. According to Dr. Liang, Biggar reported that the surgery had some positive effects but did not fully resolve his symptoms: "The tremor is almost all gone, was worse on the left, and cramping is much improved. His balance has not improved, but he is moving around more. After being quiet for awhile he has minor trouble with speech. His finger coordination is not as good, esp when typing." AR 1133. Hoping that the DBS surgery had significantly reduced his symptoms, Biggar began working full time on April 14, 2014. AR 451-52.

**E.** **Second Work Absence and LTD Benefits Request**

Biggar's condition was not as improved as he had hoped, however, and on June 3, 2014, he again left work. AR 114-19. At the time, Biggar said he expected to return within a few weeks on June 21, 2014. Id. Dr. Liang submitted an updated APS on Biggar's behalf in June 2014. AR 446-47. The APS reported that Biggar was "having difficulty with short term memory and difficulty programming + dizziness, tremor, depression, rigidity, insomnia all due to progression of Parkinson's Disease." Id.

Shortly after this decision, on June 19, 2014, Biggar had another appointment with Dr. Liang. Her notes explain that since Biggar's "last visit, patient has had a fall in parking lot at work—walking up crossing over a curb and fell into a planter. Fell on hands and face, bloodied face." AR 1127. Biggar also reported to Dr. Liang that he was "having issues with short-term memory, difficulty with programming. Started before the dizziness, Dizziness makes it harder to sit at desk and work." Id. He described "increased tremor, stiffness," AR 1128, and "[i]ncreased depression re: symptoms which persist and are interfering with ability to work, especially cognition- attn., focus and cognitive processing." Despite those notes, Dr. Liang's general examination recorded that Biggar had "normal" mental status, that he displayed no "rest tremor" or "action tremor," that his "[g]ait was essentially normal," and that his "postural stability/balance" was "normal." AR 1129. At the end of the visit, Dr. Liang concluded that "given new symptoms due to the fall, and continued incomplete recovery from the DBS surgery with regard to [Parkinson's Disease] control and cognitive issues, [Biggar] is not fit to resume work at this time." AR 1130.

Biggar visited Dr. Liang again in August and October of 2014. In August, Dr. Liang reported that "[s]ince last visit, patient has had good success with tremor control but continues with balance issues." AR 1121. "He is still struggling with depression issues," but his "[s]leep may be a little better." Id. Dr. Liang also wrote that Biggar was "[t]rying to work on a new business idea." Id. They discussed Biggar's "work situation" and Dr. Liang stated that "because of complications of PD symptoms including coordination programs, tremor, and cognitive/psych issues ongoing, he is still not able to go back to work to perform usual duties and responsibilities

at this time." AR 1124. She advised that they "reassess in several months after new DBS and antidepressant adjustments." Id. Despite these negative comments, as with her prior examinations, Dr. Liang recorded Biggar's mental status and cognition as "normal," observed no rest or action tremors, and rated his postural stability/balance as normal." AR 1123. She did note that he had "slight rigidity," a "slightly slow" gait, and "slightly soft" speech. Id.

Biggar's next visit with Dr. Liang occurred on October 23, 2014. As with prior visits, Biggar described some symptoms as worse, and some as improved: "Since last visit, patient has experienced less dizziness and right facial pulling, but now his right-handed tremor has returned a bit when totally relaxed, very slight and not too bothersome." AR 1116. Biggar continued to report problems with his mood, his sleep, and "complain[ed] of worse balance" and "short term memory issues." Id. Nonetheless, Dr. Liang described Biggar's symptoms as "managed on current regimen." Id.

### F. Prudential Reviews Biggar's Second LTD Claim

To assess Biggar's claim, Prudential retained several physician experts. First, Dr. Joel Shenker, a neurologist conducted a paper review of Dr. Liang's records. AR 1027. He attempted but was unable to speak with her in person or by phone. Id. Dr. Shenker summarized Dr. Liang's notes of her visits with Biggar from 2009 onward and concluded that, as of June 2014, they:

> reveal fairly mild severity functional impairments, and as such these would not result in significant restrictions beyond stating that claimant should avoid constant activities requiring bending, standing up from a seated position, walking, using stairs, climbing, lifting or carrying weights over 10 pounds . . . . Fine dexterous motor movements would also likely be expected to be affected based on the objective examination findings with constant or continuous activity, but non-constant and frequent use of such activities should be permitted.

AR 1032. Dr. Shenker found that Biggar's more severe self-reported symptoms were not supported by Dr. Liang's objective examination findings. For example, Dr. Shenker explained that on June 19, 2014, "Dr. Liang directly observed that all domains of mental function were normal, postural stability balance was 'normal,' gait was 'essentially normal,'" and so on. AR 1033. According to Dr. Shenker, these "findings would not be expected to be significantly functionally impairing," id., and therefore did not support her conclusion that Biggar was "not fit to resume work," AR 1130. Dr. Shenker also opined that DBS would not have been performed in someone who was known to be cognitively impaired. AR 1034.

Prudential also obtained an obtained an independent psychiatrist review by Dr. Gregory Barclay. AR 1035-36. Dr. Barclay concluded that "[f]rom a psychiatric perspective only, the medical evidence is insufficient to support restrictions and limitations from 6/3/14 forward." Id. He explained that "[i]n order to determine limitations and restrictions, there must be objective evidence of impairment in cognitive function. That documentation is lacking throughout the file." Id. Although Biggar self-reported symptoms of depression, those symptoms could not be confirmed through Dr. Mao's notes, which were illegible. Id. Nor were they corroborated by Dr. Liang's assessments, because although she noted Biggar's self-reported depression, her own examination documented "normal" mental status, including language fluency and comprehension. Id. Dr. Barclay explained that while self-reported symptoms can be probative of disability, when "self-reported impairment is the only basis on which to determine true impairment, then at a minimum the file must contain an objective analysis of self-report reliability," such as "rating scales, measured cognitive impairment via formal metal status examinations, [or] neuropsychological testing findings." Id.

Finally, Prudential obtained a vocational review. AR 1463-65. The vocational analyst ("VOC") examined the job description for a senior software engineer at Google, and concluded that Biggar's position was mainly "sedentary." Id. Specifically, "[t]he individual would primarily be seated but may involve standing or walking for brief periods throughout the workday," that the job "require[ed] occasional reaching and handling," and "frequent keyboarding." Id. The VOC described the cognitive demands as "[s]kills in complex problem solving, systems analysis and evaluation." Id.

Based on the conclusions of Dr. Shenker, Dr. Barclay, and the VOC, Prudential denied Biggar's claim on December 12, 2014. AR 1372-79. Prudential's denial letter summarized the findings above and then concluded that:

> While your medical records reflect medically supported restrictions and limitations from a physical standpoint, these restrictions and limitations do not preclude your ability to perform your regular occupation. Therefore, we have determined that you do not meet the definition of disability as defined below and have denied your claim for a recurrent disability.

AR 1375.

**G.      Biggar Appeals Prudential's Decision**

Biggar appealed Prudential's decision on June 9, 2015.  AR 1053-57.  In a letter to Prudential, Biggar's attorney stated that he was in the processing of obtaining additional supporting records, and asked that Prudential defer its review.  Id.  Biggar agreed to toll the deadline for Prudential to decide the appeal "until its receipt of this additional information."  Id.  On July 27, 2015, Biggar mailed Prudential copies of the "Social Security Administration's award of benefits to Mr. Biggar, finding that he became disabled under their rules as of June 3, 2014" and asked that Prudential "begin [its] review of this claim."  AR 1193.  Despite the date of the letter, it appears Prudential did not receive the information until mid-August because on August 6, 2015, it sent Biggar a letter saying it had yet to receive any supplemental records.  AR 1388.  In that same letter, Prudential said it would allow Biggar forty-five days to supplement the record but would proceed anyway if it had not received anything by September 21, 2015.  Id.  Prudential also stated that when it did resume its review "an extension of up to 45 days will be taken to complete our appeal review."  Id.

On August 13, 2015, after receiving Biggar's July 27 correspondence containing his Social Security Administration ("SSA") award, Prudential sent Biggar another letter.  AR 1390.  The letter asked Biggar to confirm that he provided Prudential with same information that he had provided to the SSA.  Id.  After notifying Biggar that it would need an "extension of up to 45 days to make an appeal determination . . . per our previous correspondence to you dated August 6, 2015," Prudential advised Biggar that it would make a final decision by September 25, 2015.  Id.  Prudential claims it never received a response to this letter.

Also on August 13, 2015, Prudential asked Biggar to provide an updated Medical Authorization form, which had expired.  AR 1398.  This letter did not include any mention of an extension of time to decide the appeal.  Id.  Biggar responded with the requested authorization forms on August 21, 2015.  AR 1202.

Prudential sent Biggar another letter on September 25, 2015, saying it was "not able to complete the appeal review . . . by September 25, 2015, the 90th day of the LTD appeal review appeal," and "requesting [] permission" to extend the appeal decision deadline to October 9, 2015.  AR 1404.  Prudential stated that it would proceed even if Biggar did not respond, and promised

that it would "communicate [its] determination on appeal to [Biggar] as soon as [its] review [was] completed but in no event later than October 9, 2015." Id.

Despite setting this deadline, Prudential sent Biggar another letter on October 5, 2015. AR 1404. Prudential explained that its "independent medical reviewer" learned during a call with Dr. Mao that Biggar "underwent Neuropsychological evaluation in April, 2015," and requested confirmation that the examination occurred and its results. Id. On October 9, 2019, Prudential sent another letter notifying Biggar that it would not meet the October 9 deadline it previously set because it was waiting for the records requested in its October 5 letter. AR 1408. Prudential set a new decision deadline of October 31, 2015. Id. Biggar never responded to these document requests.

## H.   Prudential Denies Biggar's Appeal

On October 27, 2017, Prudential completed its review of Biggar's appeal and upheld its denial of his LTD benefits claim. AR 1415. In support of this decision, Prudential obtained a second round of independent evaluations by a neurologist, psychiatrist, and VOC. Dr. Sarbjot Dulai, neurologist, again reviewed Dr. Liang's record, and concluded that Biggar's "current clinical symptoms from Parkinson's disease are mild; therefore, he is able to work in a full time capacity with the above restrictions in place." AR 1206. Dr. Warren Taff,[5] psychiatry, also analyzed Biggar's records. AR 1208-12. Dr. Taff's conclusions mirror Dr. Barclay's. Dr. Taff described "inadequate documentation of disabling symptoms from a primary psychiatric condition" and a lack of "concrete objective evidence of symptoms that would have a direct and negative impact on the claimant's work-related functions which are not validated by the submitted medical records." AR 1210. Most important, Dr. Taff found that Biggar's "psychological condition doesn't restrict or limits his ability to focus/concentrate, work independently and with others, communicate effectively verbally and via written correspondence, multitask, analyze

---

[5] Biggar claims the administrative record closed in this case on October 20, when he filed suit. ECF No. 50 at 28 (citing Neathery v. Chevron Texaco Corp. Grp. Acc. Policy No. Ok-826458 & Acc. Policy No. SLG-000784, 303 F. App'x 485, 487 (9th Cir. Dec. 15 2008). Biggar therefore argues that the Court cannot consider the medical opinions contained in that denial. The Court rejects this argument because, among other reasons, the relevant opinion reports were prepared before the alleged record closure. For example, Dr. Shenker submitted his report in December 2014, AR 1032, and Dr. Taff's report was completed on September 22, 2015, AR 1204.

information, or sustain full time work activity on a consistent and reliable basis." Id. Finally, Prudential obtained a second vocational review. The VOC again found that Biggar's "substantial and material acts are in line with the restrictions and limitations outlined" because his "usual occupation is performed seated with occasional reaching, handling, fingering and frequent keyboarding," and his symptoms did not prevent him from accomplishing those tasks. AR 1470-71.

On October 23, 2017, before receiving Prudential's appeal decision, Biggar filed this suit in federal court. ECF No. 1. Both parties have now filed motions for summary judgment. ECF Nos. 49, 50.

## II.    LEGAL STANDARD

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Here, the parties have agreed that de novo review is appropriate. ECF No. 49 at 20; ECF No. 50 at 25. Under de novo review, "the court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits with no deference given to the administrator's decision." Abatie v. Alta Health & Life Ins. Co., 458 F.3 955, 963 (9th Cir. 2006) (en banc). The burden of proof is placed on the claimant, who must show, "by a preponderance of the evidence, that she was disabled under the terms of the plan during the claim period." Eisner v. The Prudential Ins. Co. of Am., 10 F. Supp. 3d 1104, 1113–14 (N.D. Cal. 2014); see also Muniz v. Amec Const. Mgmt., Inc., 623 F.3d 1290, 1294 (9th Cir. 2010).

Federal Rule of Civil Procedure 52 contemplates that an "action [may be] tried on the facts without a jury." [6] "In a trial on the record, the court 'can evaluate the persuasiveness of conflicting

---

[6] Defendants moved for summary judgment under Federal Rule of Civil Procedure 56, but ask that the Court convert the motion for judgment under Rule 52 if it concludes that a dispute of material fact remains. Defendants are correct that, if the Court were to find a dispute of material fact that precluded summary judgment, it would need to go on to conduct a trial on the record under Rule 52. See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999) (reversing grant of summary judgment for plan administrator due to disputed fact, and remanding to district court for Rule 52 analysis in the first instance). Because the "usual rule" in ERISA cases is that "the existence of a material factual dispute precludes summary judgment," Sabatino v. Liberty Life

testimony and decide which is more likely true.'" Shaw v. Life Ins. Co. of N. Am., 144 F. Supp. 3d 1114, 1123 (C.D. Cal. 2015) (quoting Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999)). See also Schramm v. CNA Fin. Corp. Insured Group Benefits Program, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010) (in reviewing the administrative record, "the Court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate"). The bench trial may "consist[ ] of no more than the trial judge reading [the administrative record]." Eisner v. The Prudential Ins. Co. of Am., 10 F. Supp. 3d 1104, 1113–14 (N.D. Cal. 2014) (quoting Kearney, 175 F.3d at 1095).

## III.    ANALYSIS

### A.    Exhaustion

Defendants first argue that it is entitled to judgment because Biggar failed to exhaust his administrative remedies before filing suit in federal court. ECF No. 49 at 21. As a general matter, "an ERISA plaintiff claiming a denial of benefits 'must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court.'" Vaught v. Scottsdale Healthcare Corp. Health Plan, 546 F.3d 620, 626 (9th Cir. 2008) (quoting Diaz v. United Agric. Employee Welfare Benefit Plan & Trust, 50 F.3d 1478, 1483 (9th Cir. 1995).

Under the relevant regulations, the general rule is that Prudential had 45 days to decide Biggar's appeal. ECF No. 49-5.[7] There are two ways of extending that deadline. First, the regulations state that "[i]f the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial [45]-day period." Id. That provision is limited, however, because the regulations also warn that "[i]n no event shall such extension exceed a period of [45] days from the end of the initial period." Id. The second potential for a longer deadline arises when the claimant fails to "submit the information necessary to decide the claim." Id. at 7. In that situation,

---

Assur. Co. of Boston, 286 F. Supp. 2d 1222, 1229 (N.D. Cal. 2003), for purposes of judicial economy, the Court will proceed directly to analyze Biggar's claim under Rule 52.
[7] Defendants ask the Court to take judicial notice of the version of the relevant ERISA regulations that were in effect when Biggar filed his claim for benefits and when Prudential made its decision. ECF No. 49-4. The regulations have since been amended. This is a public record properly subject to judicial notice, and the Court grants the request. See Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001).

so long as the plan administrator provides notice to the claimant, "the period for making the benefit determination on review shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information." Id.

Applying those regulations here, Defendants claim their deadline for an appeal decision had not lapsed by the time Biggar filed his case on October 20, 2017. Taking the tolling provision first, it is clear that the deadline was at least tolled from July 9, 2015, when Biggar appealed, to July 27, 2015, when he submitted his SSA award, since his July 9 letter specifically asked that the deadline be tolled until he submitted those records. AR 1193. Moreover, the July 9 letter asked Prudential to "begin [its] review of this claim," indicating that Biggar did not intend to provide any additional records. Id. With an original deadline of July 22, 2015 (July 9 plus 45 days), the tolling from this period would have extended Prudential's deadline 48 days to August 9, 2015.[8] Defendants argue that the various other requests they made for additional records from Biggar, for example on August 6, 2015 or September 25, 2015, likewise tolled the deadline. The Court disagrees. AR 1388, 1404. First, although those letters all request documents, they also include the following caveat: "If we do not receive this information within that timeframe, we will proceed with our review of Mr. Biggar's claim based upon the information on file as of [a certain date]." E.g., AR 1388. This suggests that the information requested was not *necessary* to decide the claim," as the regulation requires for tolling to apply. Moreover, Defendants set deadlines for themselves in each of those letters that were untethered from the time it took for Biggar to respond. Under Defendants' theory, a plan administrator could repeatedly supplemental documents such that tolling would prevent the claimant from filing suit in federal court, all the while ignoring deadlines it had set for itself and communicated explicitly to the claimant. This cannot be what the regulations intend. In sum, the tolling provision for additional records only extends Prudential's deadline to August 9, 2015.

Nor does the second regulation permitting extensions get Prudential past October 20, 2015. Under that provision, a plan administrator can request a one-time automatic 45-day extension if it

---

[8] The Court uses the date that Biggar sent the supplemental documents, because Defendants do not state the date the documents were received.

determines "that an extension of time for processing is required." ECF No. 49-5 at 10. However, the regulations explain that "[i]n no event shall such extension exceed a period of [45] days from the end of the initial period." Even assuming the end of the initial period is August 9, 2015 rather than July 22, 2015 (including the days added for tolling), 45 additional days puts the deadline at September 23, 2015.

The Court rejects Defendants' exhaustion argument.

## B.    Merits

Next, Defendants argue that Biggar has failed to meet his burden to demonstrate disability under the LTD Policy. ECF No. 49 at 14-20. The Court agrees. Plaintiff has failed to show, "by a preponderance of the evidence, that [he] was disabled under the terms of the plan during the claim period." Eisner v. The Prudential Ins. Co. of Am., 10 F. Supp. 3d 1104, 1113–14 (N.D. Cal. 2014). Generally speaking, the evidence supporting Biggar's disability claim can be divided into two categories: physical limitations and cognitive impairment. The Court addresses each in turn. [9]

### 1.    Physical Limitations

Biggar claims that he experienced various physical limitations due to his Parkinson's Disease, including loss of manual dexterity, tremors in his hands, difficulty with balancing, weight loss, and sleepiness. See generally ECF No. 50 at 15-16. Neither party argues that Biggar suffered *no* physical limitations as a result of his Parkinson's Disease. Rather, the question is whether those limitations were so severe that they prevented him from "perform[ing] with reasonable continuity the substantial and material acts necessary to pursue your usual occupation." AR 2003.

Defendants claim that "Plaintiff's medical records show only minimal physical limitations due to his Parkinson's, such as minimal slowness in movements, slight rigidity in the extremities bilaterally, slightly stooped posture, inconsistent slight gait problems and only occasional shaking in the hands." ECF No. 49 at 24. In other words, although Biggar suffered some adverse physical

---

[9] Defendants emphasize that a diagnosis of Parkinson's Disease alone is insufficient to demonstrate disability. ECF No. 49 at 24 (citing Holifield v. UNUM Life Ins. Co. of Am., 640 F. Supp. 2d 1224, 1237 (C.D. Cal. 2009) ("It is an individual's ability to function, not simply their diagnosis, that entitles him or her to disability benefits.")). That is true, but Biggar never argues that his diagnosis alone entitles him to benefits.

14

side effects from his disease, they were minor and did not substantially impact his ability to do his job. Biggar objects, pointing out that Dr. Liang's notes often document serious physical problems. For example, after their June 19, 2014 visit, Dr. Liang wrote that since Biggar's "last visit, patient has had a fall in parking lot at work—walking up crossing over a curb and fell into a plantar. Fell on hands and face, bloodied face." AR 1127. She also documented his reports that he was having "difficulty with programming" and described "increased tremor, stiffness," AR 1128. Defendants argue, however, that these accounts of Biggar's self-reported symptoms are contradicted by Dr. Liang's own examination of Biggar during his visit. Dr. Shenker, who reviewed Dr. Liang's visit notes, explained how her general examination recorded that Biggar displayed no "rest tremor" or "action tremor," that his "[g]ait was essentially normal," and that his "postural stability/balance" was "normal." AR 1129. The only limitations she recorded were "mild" dyskinesia, mildly stooped posture, and "slight rigidity." Id.[10]

This same dichotomy between Dr. Liang's reporting of Biggar's self-reported symptoms and the results of her own examinations appears in the August and October 2014 visit records as well. In August, Dr. Liang reported that "[s]ince last visit, patient has had good success with tremor control but continues balance issues." AR 1121. Nevertheless, she rated his postural stability/balance and motor strength as "normal" during her standard examination. AR 1123. Similarly, after Biggar's October visit, Dr. Liang described Biggar's explanation of his own symptoms: "Since last visit, patient has experienced less dizziness and right facial pulling, but now his right-handed tremor has returned a bit when totally relaxed, very slight and not too bothersome." AR 1116. Yet her exam reported no rest or action tremors and that his "postural stability/balance" was "normal." AR 1118.

After each of these visits, Dr. Liang concluded that Biggar was unable to return to work. In June, she stated that "given new symptoms due to the fall, and continued incomplete recovery from the DBS surgery with regard to [Parkinson's Disease] control and cognitive issues, [Biggar] is not fit to resume work at this time." AR 1130. In August, after discussing Biggar's "work

---

[10] Defendants also argue that the notes from Biggar's February 2014 visit do not show severe symptoms. ECF No. 49 at 25. But that visit occurred right after Biggar returned to work and several months before the LTD benefits claim at issue here. Therefore, Biggar's symptoms at that time are not particularly relevant.

situation," Dr. Liang stated that "because of complications of PD symptoms including coordination programs, tremor, and cognitive/psych issues ongoing, he is still not able to go back to work to perform usual duties and responsibilities at this time." AR 1124.

Defendants object that Dr. Liang's conclusions are not supported by her own examinations. The Court agrees that Dr. Liang's statements in June and August that Biggar's Parkinson's symptoms were so severe that he could not work are undermined by her own contemporaneous findings that he had normal balance, no observed tremors, and normal motor strength. AR 1118, AR 1123; see Graham v. First Reliance Standard Life Ins. Co., No. 04 CIV 9797 NRB, 2007 WL 2192399, at *2 (S.D.N.Y. July 31, 2007) (rejecting claimant's arguments that his tremors prevented him from working where his doctor's reports "did not indicate or reflect any significant tremor symptoms" and included comments like, "no significant tremor or rigidity noted"). Moreover, at the end of her October notes, Dr. Liang described Biggar's symptoms as "managed on current regimen" and Biggar himself stated that his tremor was not "too bothersome."[11] AR 1116. It appears, therefore, that to find Biggar disabled Dr. Liang credited Biggar's self-reported symptoms over her own examination results. Dr. Shenker, the neurologist retained by Prudential, criticized Dr. Liang's conclusions on this basis, explaining that her examinations "reveal fairly mild severity functional impairment," and that Biggar's more severe self-reported symptoms were not supported by those objective examination findings. AR 1032.

Biggar claims Defendants are impermissibly imposing a requirement that he put forward "objective evidence" of his symptoms.[12] ECF No. 50 at 28. The Court disagrees. Defendants are pointing out that Liang's objective examination records *contradict* Biggar's subjective reports of his symptoms, and that this objective evidence is a more reliable basis for making a disability determination. As another court in this district explained, although a claimant need not "provide objective evidence of disability, subjective evidence of a disabling condition is inherently less reliable than objective evidence." Langlois v. Metro. Life Ins. Co., No. 11-CV-03472 RMW,

---

[11] Defendants exaggerate the importance of this statement, which referred only to the tremor in his right, AR 1116, not all of his Parkinson's symptoms, as they suggest.

[12] Many of Biggar's arguments apply to his evidence of cognitive impairment also, and the Court's analysis is applicable to both types of evidence.

2012 WL 1910020, at *14 (N.D. Cal. May 24, 2012). This is particularly true when "self-reported symptoms are contradicted by testing . . . ." Id.

Biggar also objects that Defendants accepted the opinions of non-examining doctors like Dr. Shenker over the opinion of his treating physician, Dr. Liang. In ERISA cases, however, the Supreme Court has held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Rather, the weight assigned to a physician's opinion will vary according to various factors, including "(1) the extent of the patient's treatment history, (2) the doctor's specialization or lack thereof, and (3) how much detail the doctor provides supporting his or her conclusions." Shaw v. Life Ins. Co. of N. Am., 144 F. Supp. 3d 1114, 1129 (C.D. Cal. 2015). "[T]he more detail a physician provides concerning the bases for his or her diagnosis and opinion, the more weight his or her conclusions are afforded." Id. at 1130-31. Put another way, "[a] physician's opinion is more credible when supported by medical and vocational evidence of contemporaneous functional limitations." Graham v. First Reliance Standard Life Ins. Co., No. 04 CIV 9797 NRB, 2007 WL 2192399, at *2 (S.D.N.Y. July 31, 2007).

Here, there is good reason to discount Dr. Liang's conclusion that Biggar could not work. Although Dr. Liang treated Biggar for many years, her conclusions about the severity of Biggar's symptoms are not supported by her own contemporaneous general examinations of Biggar's physical condition. Indeed, she repeatedly described his postural stability/balance and motor strength as "normal," and observed no rest or action tremors. E.g., AR 1118, AR 1123. It is not improper to discount even a treating physician's diagnosis where it does "not have supportive objective evidence, [is] contradicted by other statements and assessments of [the claimant's] medical condition, and [is] based on [the claimant's] subjective descriptions of pain." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

The Court concludes that Biggar has failed to demonstrate that he suffered from physical impairments so substantial that they prevented him from "perform[ing] with reasonable continuity the substantial and material acts necessary to pursue your usual occupation." AR 2003.

### 2. Cognitive Impairment

Biggar's disability claim is also based on cognitive impairment. However, the evidence of

cognitive impairment suffers from the same weaknesses described above: while Dr. Liang's notes contain significant self-reported symptoms, her examinations contradict those reports. After the June 2014 visit, for example, Biggar told Dr. Liang that he was "having issues with short-term memory, difficulty with programming. Started before the dizziness, Dizziness makes it harder to sit at desk and work." AR 1127. Dr. Liang also noted that Biggar suffered from "[i]ncreased depression re: symptoms which persist and are interfering with ability to work, especially cognition- attn., focus and cognitive processing." AR 1128. By contrast, Dr. Liang's general examination recorded that Biggar had "normal" mental status, and that his "recall," "language fluency and comprehension" were "intact. AR 1129. Likewise, in August, Dr. Liang wrote that Biggar claim to be "still struggling with depression issues." AR 1121. But again, her examination recorded Biggar's mental status and cognition as "normal." AR 1122.

Dr. Liang's internally inconsistent notes are similar to those the district court rejected in Graham, another case involving a claimant with Parkinson's disease. 2007 WL 2192399, at *4. In that case, although the claimant's doctor "describe[ed] [his] higher integrative functions as "alert, attentive, [and] oriented without receptive or expressive speech difficulties," he nevertheless reaches the conclusory result that [the claimant] was totally disabled." Id. The court also noted how the doctor's conclusion conflicted with other evidence that the claimant "was in good mental shape" with "normal attention and memory." Id. at *5. The same is true here. For all the reasons described above with respect to physical impairment, Prudential's retained psychological experts Dr. Barclay and Dr. Taff rejected Dr. Liang's conclusion that "cognitive/ psych issues" prevented Liang from "[going] back to work to perform usual duties and responsibilities at this time." AR 1124.[13]

Dr. Liang's conclusions regarding Biggar's psychiatric condition are arguably entitled to even less weight than her conclusions about his physical impairments because Dr. Liang is not a

---

[13] Dr. Barlcay was careful to explain that while self-reported symptoms can be probative of disability, when "self-reported impairment is the only basis on which to determine true impairment, then at a minimum the file must contain an objective analysis of self-report reliability," such as "rating scales, measured cognitive impairment via formal metal status examinations, [or] neuropsychological testing findings." Id. In other words, Dr. Liang's notes lacked any standardization or formality in the recordkeeping of Biggar's self-reported cognitive impairment

psychiatrist. Another district court in this circuit has explained that "at practitioner of internal medical is not in as good a position as a psychologist or psychiatrist to form the type of in-depth functional conclusions necessary to conclude that a mental condition is disabling." Shaw v. Life Ins. Co. of N. Am., 144 F. Supp. 3d 1114, 1129 (C.D. Cal. 2015). The same is true of a neurologist here. Dr. Mao, Biggar's psychiatrist, is better-positioned to evaluate Biggar's depression and its impact on his cognition, but Dr. Mao's notes are illegible. Although Dr. Mao told Dr. Taff by phone that Biggar "had as much objective evidence of depression 'as is possible in psychiatry,'" there is no way to confirm that diagnosis absent any legible written records or any of the underlying objective evidence. AR 1233. Finally, although Dr. Mao stated that Biggar received an evaluation at Stanford that confirmed Dr. Mao's diagnosis, Biggar never provided those records to Defendants. AR 1233.

Moreover, Dr. Shenker also opined that DBS surgery would not have been performed in someone who was known to be cognitively impaired. AR 1034. Biggar does not respond to this point in his opposition brief. Therefore, the fact that Biggar underwent this surgery further undermines his claim of cognitive impairment.

Given the absence of useful records from Dr. Mao combined with the inconsistencies in Dr. Liang's records, the Court concludes that Biggar cannot show by a preponderance of the evidence that his cognitive impairments left him disabled under the LTD Policy.

### 3. Social Security Administration Award

Soon after appealing Prudential's benefits denial decision, Biggar mailed Prudential copies of the "Social Security Administration's award of benefits to Mr. Biggar, finding that he became disabled under their rules as of June 3, 2014." AR 1193. Biggar argues that Prudential "failed to give that decision anything but lip service despite the fact that it utilizes a more stringent standard of disability." ECF No. 50 at 27.

A decision by the SSA awarding disability benefits is not binding on an insurance company's disability determination, although it is "some evidence of disability." Paese v. Hartford Life Accident Ins. Co., 449 F.3d 435, 442 (2d Cir. 2006). Nevertheless, "a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the

decisionmakers relied." <u>Montour v. Hartford Life & Acc. Ins. Co.</u>, 588 F.3d 623, 636 (9th Cir. 2009). Where the "administrative record . . . only contains the SSA's award letters without the opinion by the SSA administrative law judge (ALJ) or the SSA administrative record on which that decision was based," it is "more difficult" to compare the "two opposing disability determinations." <u>Id.</u> Certainly, it would have been relevant had the SSA found Biggar disabled based on the same evidence that Prudential relied on to deny benefits here. But because the SSA award may well have been based on medical evidence that was never produced to Prudential and is therefore not before this Court, the Court cannot place much weight on the fact of Biggar's SSA award for purposes of his ERISA claim.

### 4. VOC Reports

The VOC described the senior software engineer position as mainly "sedentary." <u>Id.</u> Specifically, "[t]he individual would primarily be seated but may involve standing or walking for brief periods throughout the workday," that the job "require[ed] occasional reaching and handling," and "frequent keyboarding." <u>Id.</u> The VOC described the cognitive demands as "[s]kills in complex problem solving, systems analysis and evaluation." <u>Id.</u> The VOC found that Biggar's limited physical and cognitive symptoms would not prevent him from performing this sedentary position.

Biggar does not challenge the VOC reports, except to the extent they relied on improper conclusions about his medical record, rather than on the conclusions of his treating physicians. ECF No. 53 at 17. As explained above, however, the Court agrees with the conclusions of Prudential's medical experts.

***

Most importantly, Dr. Liang's examinations of Biggar's condition in June, August and October 2014, documented only minimal physical and cognitive impairments. They therefore undermine Biggar's more severe self-reported symptoms. After reviewing the administrative record, the Court concludes that Biggar has failed to show, "by a preponderance of the evidence, that [he] was disabled under the terms of the plan during the claim period." <u>Eisner</u>, 10 F. Supp. 3d at 1113–14.

**C.     Equitable Relief Under 29 U.S.C. § 1132(a)(3)**

In addition to his claim for benefits under 29 U.S.C. § 1132(a)(1)(B), Biggar seeks

equitable relief under section 1132(a)(3).  Compl. ¶ 21.  Specifically, Biggar claims that:

> In refusing to pay the benefits at issue herein, defendant Prudential has violated the
> terms of the PLAN, ERISA and Department of Labor Regulation 29 C.F.R.
> § 2560.503-1, by its acts, including, but not limited to, breaching its fiduciary
> duties under ERISA § 404 (29 U.S.C. § 1104); violating the terms of the PLAN;
> failing to furnish plaintiff with documents relating to his claim for benefits within
> the time period specified by the applicable Department of Labor Regulations;
> acting in bad faith by denying his claim in reliance upon a standard not set forth in
> the PLAN; failing to provide specific reference to pertinent PLAN provisions on
> which the denial was based; failing to provide plaintiff with a description of what
> information was needed to perfect his claim; and ignoring evidence, medical
> records and physicians' opinions which support plaintiff's claim.

Id.  As a remedy, he seeks a declaration that he is entitled to benefits, a declaration that Prudential

breached its fiduciary duties, and removal/replacement of Prudential as fiduciary of the Plan.

Compl. at 6.[14]

The Supreme Court has "emphasized that section 1132(a)(3) is a 'catchall' provision which

provides relief only for injuries that are not otherwise adequately provided for."  Forsyth v.

Humana, Inc., 114 F.3d 1467, 1474 (9th Cir. 1997), overruled on other grounds by Lacey v.

Maricopa Cty., 693 F.3d 896 (9th Cir. 2012) (quoting Varity Corp. v. Howe, 516 U.S. 489, 511

(1996).  In other words, "where Congress elsewhere provided adequate relief for a beneficiary's

injury, there will likely be no need for further equitable relief, in which case such relief normally

would not be 'appropriate.'"  Varity Corp., 516 U.S. at 515.

Here, Biggar's section 1132(a)(3) claim duplicates his benefits claim under section

1132(a)(1)(B).  The language of Biggar's complaint is telling:  Biggar alleges that he is entitled to

equitable relief because Prudential violated the law "[i]n refusing to pay the benefits at issue

herein . . . ."  Compl. ¶ 21.  Relatedly, in his opposition to Defendants' motion for summary

judgment, Biggar asks the Court to "declare [his] right to receive future long term disability

benefit payments."  ECF No. 53 at 17.  Particularly given that the Court already found above that

---

[14] As an initial matter, Plaintiff does not address his claim for equitable relief in his cross-motion
for summary judgment.  He does, however, briefly discuss it in opposition to Defendants' motion.
ECF No. 53 at 18-19.  Therefore, Biggar did not waive his right to oppose summary judgment on
this claim.

Biggar is not entitled to benefits under the LTD Policy, this claim for equitable relief is also denied.[15] See Ford v. MCI Communications Corp. Health & Welfare Plan, 399 F.3d 1076, 1082–83 (9th Cir. 2005) overruled on other grounds by Cyr v. Reliance Standard Life Ins. Co., 642 F.3d 1202 (9th Cir. 2011) (affirming the district court's dismissal of the plaintiff's claim for equitable relief, because he had already "asserted specific claims under 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(2)").

To the extent Biggar's claim for equitable relief is rooted in Prudential's alleged breach of its fiduciary duties, rather than its denial of benefits, that claim too is duplicative. Other of ERISA's other statutory provisions specifically cover breach of fiduciary duty and removal of the fiduciary. E.g., Wise v. Verizon Commc'ns, Inc., 600 F.3d 1180, 1190 (9th Cir. 2010) ("Because removal of the ERISA fiduciary is an available remedy under §§ 1109(a) and 1132(a)(2), Wise may not resort to this equitable catchall provision to seek the same relief."). Moreover, Biggar's conclusory response to Defendants' motion does not raise a genuine issue of material fact as to breach of fiduciary duty. All Biggar does is quote from his own letter appealing Prudential's benefits denial, which makes generalized statements about the deficiencies in Prudential's denial decision. ECF No. 53 at 17-18 (claiming the denial letter was "extremely conclusory" and "utilizes the wrong definition of disability"). This response is insufficient to prevent summary judgment on Biggar's section 1132(a)(2) claim.

**CONCLUSION**

The Court grants judgment for Defendants.

IT IS SO ORDERED.

Dated: August 11, 2017

_____
JON S. TIGAR
United States District Judge

---

[15] Biggar's arguments that Defendants failed to provide specific reasons for the benefits denial and failed to describe the supplemental information required to perfect his claim are part and parcel of his claim for recovery of benefits under section 1132(a)(1)(B).